United States v. Bianchi Mr. Rudofsky. Yes. May it please the court, David Rudofsky for the appellant, Anthony Mark Bianchi. This case, this appeal from the judgment of sentence from the district court. Excuse me, are you reserving rebuttal? Yeah, I'm sorry. I'm reserving two minutes, if I may, for rebuttal, Your Honor. Thank you. Presents two issues for this court's consideration. The first is a due process and compulsory witness argument concerning the district court's explicit finding that the government, in this case, intentionally and in bad faith, prevented a witness from Moldova, where these incidents allegedly occurred, from appearing at trial and testifying as a witness. That's the first issue in terms of due process. The second issue concerns the reach of the Foreign Commerce Clause. Where does the district court found the government prevented him from testifying at trial? The district court found that the government's actions prevented him from coming here. Yes. As a member of. No finding that he was not, was prevented from testifying or that he was ever intended to testify. Obviously, if he couldn't come here, he would be prevented from testifying. It's clear the government knew. It's clear the government knew from this record. First of all, we have a factual finding from the district court. Let's slow down. In the very first sentence of the court's opinion of January 8th, 09, it says this, quote, when the government, this is the issue, when the government's conduct intentionally precludes the attendance at trial of a member of the defense team, is the defendant entitled to a new trial if he fails to prove actual prejudice resulting from the misconduct, end quote. That's the court's statement of the issue. You don't disagree with that, do you? No, I do not, Your Honor. So that the court's statement of the issue did not have him as a witness. They only had him attending at trial, attending trial as a member of the defense team. And that is all the district court ever said. But that's not correct. The entire opinion addresses the fact, and in fact, the district court tries to justify its actions by saying there was no prejudice by virtue of the stipulation. The entire dispute in the district court was whether or not by preventing Mr. LaVinza from coming to the United States by announcing the fact that there was an arrest warrant and therefore giving him the clear message, don't come, prevented him from doing two things, coming here and assisting the defense team. Remember, Mr. LaVinza was hired in Moldova to help conduct the investigation there, given the cultural and language problems there. He was recommended by the United States State Department in Moldova to the defense team as a reputable investigator and lawyer in Moldova. The defense used him to investigate the case, the background of the case, to interview the complainants, and wanted to use him, if necessary, to impeach the complainants' testimony at trial. When the government, as the district court found, intentionally and in bad faith, prevented him from coming here, they did two things. They prevented him from coming and assisting generally the defense team, and as the court makes clear because it goes to the prejudice question, prevented him from testifying as a live witness before the jury as to the facts, the relevant facts, and the material facts that he had concerning Is there any evidence in this extensive record on this issue that he was ever going to testify at trial? There is testimony from the defense lawyers in this case that he was retained to do that. The government, in fact, when you look at what happened right before trial, people were going back and forth during this entire investigation. Where was his witness statement that was ordered in June? I think I can answer both questions. No. They were buying tickets on 24 hours or 48 hours notice. He was planning to come the third day of trial. In the record, there are statements from defense counsel saying that's how they traveled, that's how the government traveled, that's how witnesses from Moldova traveled. There was no need to get tickets two or three months in advance. There was no requirement in this case that he be incorporated on a witness list. The judge only required that any statements. We're not talking about a witness list. We're talking about witness statements were ordered produced. And he had no witness statements, and there was no finding that he had witness statements that weren't produced. There were e-mails going back and forth about administrative matters. Well, as part of the record, he hadn't interviewed the boys when they were due. He interviewed the boys a week before they were to come. He had interviewed the boys. There was no evidence in this record that there were any written statements as a result of his interview. He could have very well testified and been cross-examined as to his recollection of those interviews. He was there. He did those interviews. The fact that that wasn't produced, that was not the basis for the judge's finding. And, in fact, we know the government knew he was going to be a witness and was going to come to the trial by virtue of the e-mails back and forth. When did you say the government knew he would be a witness? The government knew he was coming to the United States. He was coming to the United States. But we must distinguish. I want to know, what is your best case for someone that the government prevents from assisting as a member of a defense team at trial? Well, all the cases deal with people who are going to be witnesses at trial. I'm not talking about witnesses. I'm talking as a member of the defense team. Well, obviously our claim is broader than just the defense team.  But where is the evidence supporting the claim? Cases have not come up as to defense teams. All the cases have come up in the context of someone who is helping the defense, is an investigator for the defense, or is a witness for the defense. And the government prevents him from helping the defense. And you have to show prejudice. Where is your case on that? The prejudice, I submit, Judge Barry, is a separate question. The first question that you've identified is whether or not he was going to be here and available to testify as a witness. We know that's true because the court, in fact, allowed the stipulation into evidence in which Mr. LaVinza, by stipulation anyway, and we think this was not sufficient, by stipulation was able to say facts that were relevant to this case, that were material to this case. But he was able to say a lot more than what would have been admissible if he came as a witness. Possibly yes, possibly not, Judge Roth. There's no question about it. Definitely not. There's no question that the stipulation. Without cross-examination and without a rebuttal case. And the government makes a very powerful point on just that point. And we point it in our brief. The government says, well, as you've said, he was allowed to do it without cross-examination. He was allowed to put in information that perhaps would not have been admissible at trial. And then the government made the point in argument to the jury directly. The government said in playing on this point that Mr. LaVinza was not here, that they only heard his testimony by stipulation. The government said, it's at page 1308 of the record, you have to look at the kids. One of the advantages of court systems is what's called the right of confrontation. You get to look at them. And you, as the judge will tell you, you are using the same tools you use every day when you decide if someone is telling the truth or not. Look at those boys. So the government played on the fact. Played on the fact. First of all, they intentionally and in bad faith prevented Mr. LaVinza from coming. And then argued to the jury, what do you have here? You have all the complainants. They've come to the United States. They've subjected themselves to cross-examination and confrontation. You have the opportunity as a jury to view them. You see their demeanor. You can make a judgment about their credibility in the same way you make those judgments in your everyday life. And you didn't have that with Mr. LaVinza. LaVinza's credibility as to what the boys told him was not really under attack. It wasn't directly attacked, but it was in question. For example, the prosecutor did say, well, what would you expect these boys to say in that situation? That's common sense. They're not saying the boys didn't say it. He didn't have the opportunity. Credibility aside, he did not have the opportunity, except in a cold, stipulated statement. And as the Supreme Court said, an old chief. The only judgment he could ever make if he were there squirming under cross-examination, correct? The question is whether he would squirm under cross-examination or not. The jury would have at least had that opportunity to assess his credibility. If Mr. LaVinza came and testified, he would have been the gift that kept on giving to the government on cross-examination. And you want to know what else? The boys would have been returned for a rebuttal case. Those four boys that he approached. And if that's true, why did the government intentionally prevent him from coming, Judge Barry? Well, let me ask you this question. That's what the judge found, that because they notified, that was the mistake the judge found. That they notified you, your predecessors. Right. That there was an arrest warrant they planned to have issued, and it was issued that day, July 14th. Okay. They notified you. But the judge said, and you agreed below. Well, see, that was evidence of the fact that they were preventing him from coming. But had he came and had the plane landed, they could have arrested him when he got here. That's right. So how would he have testified then? You found nobody had any problem with that. When he gets off the plane, then you arrest him. You didn't prevent him from coming. He would have asserted his Fifth Amendment. There's no way he would have testified then. He would have been a fool. Probably would have. But what the judge found, and there's support in the record, is that the government had no intention of bringing him to arrest him. What their intent was, once they found out that the Moldovan authorities, contrary to their belief, would not detain him during the period of the trial, the government then decided the next day, let's get an arrest warrant, let's tell the defense team, because it's significant information for them, that he won't be here. That will prevent him from coming. They had no intent. They had no interest in prosecuting him. They only wanted to put the message out, if you come here, you will be arrested. That kept him in Moldova. It prevented him from both assisting the defense team and testifying at trial. But the judge thought it was perfectly fine to arrest him the day he arrived. I don't understand that. He could have testified by video, and he refused to do it. That's right, because what happened was he initially agreed to testify by video, Judge Roth. The day he was supposed to testify by video, he's then approached by Moldovan authorities, threatening him with arrest in Moldova for being involved in the investigation and testimony in this case. It's not surprising at that point that he said, they're going to get me one way or another. I'm going to stop cooperating, which, of course, led to the stipulation. Why do you still have a couple of minutes? I'm interested in the Foreign Commerce Clause. Yes, if I may turn to the Foreign Commerce Clause issue. The scope of the government's claim here is really breathtaking. According to the government, any criminal act by any U.S. citizen in any country in the world at any time can be made a crime punishable in the U.S. District Courts in the United States by virtue of the fact, which is true in every one of these situations, that somebody traveled to that foreign country sometime before they committed that criminal act. That is as broad a scope of the Commerce Clause as you can imagine and has been explicitly rejected, certainly with respect to the Interstate Commerce Clause, and there is no authority under the Foreign Commerce Clause that would support it. If we accept the reasoning of the Ninth Circuit, Judge McCune's opinion is a... The Ninth Circuit didn't reach this issue. The Ninth Circuit was very careful to say there was a commercial aspect. Both were charged in this case. Both were charged in this case. That's right, but not in this particular count. And the charge to the jury was very clear. The jury did not have to find there was any commercial aspect to the alleged illicit sex in Moldova or Romania. They were charged on both. There's obviously overlapping counts here, Judge Barrett. The proof's here. This is not a matter of the uncle of one of these. The proof may have been here. The jury was instructed. The jury was authorized to find in this case. I'm not talking about sufficiency of the evidence. The jury was authorized to find in this case if there was no commercial aspects to these transactions, simply by virtue of the fact that he had sometime previously traveled to Moldova. In that opinion, in Clark, she says if you get on a plane and you go there, the foreign commerce clause is reached. There's another discussion as to the acts themselves, but she is satisfied that the foreign commerce clause is not. The Ninth Circuit, if I'm not mistaken, dropped a footnote saying we don't reach the non-commercial aspects of this kind of charge. And it's only where there's a commercial part of the action in which they found. And, of course, commerce is the point. How is this not commercial? It was for money. Sex for money. This jury was not instructed. This jury was not instructed that they had to find that there was any commercial transaction with respect to that act. If the government had asked for that, then you'd have a different case. This jury was authorized by the specific instructions of the judge. Look at the instructions to the jury. Prosecution and conviction was authorized under this count simply by fact that he traveled to Moldova and had illicit sex. There is nothing in the judge's charge to the jury requiring the jury to find beyond a reasonable doubt or by anything that there was any commercial aspects to any of those. They were charged on both commercial and non-commercial? They were charged with traveling. He was charged with traveling with the intent to engage in. I'm talking about counts 3, 5, and 10. That's right. On this count, the instruction to the jury, the three counts in which he was convicted, authorized the conviction simply by virtue of the fact that he traveled to Moldova and had illicit sex. There was no requirement, no instruction that it be commercial. How is illicit sex defined in the jury charge, that it could be for commercial purposes and underage? It wasn't specified. It was just underage. They were authorized. If it was underage, they were authorized to convict. There was no requirement whatsoever. I think I don't have the charge with me. That's commercial. My recollection is he read them the statute on illicit sex. But it's an alternative. They could have found it was simply underage sex, and an instruction that permits a jury to find on one ground, you can't assume they would have found on the other. There were no special interrogatories? Not on that issue, no. Let's assume you're only challenging counts 3, 5, and 10. That's correct, Your Honor. And there are seven counts that are unchallenged. He received 300 months' concurrent sentence on all 10 counts, because 6 and 7 were dismissed during the trial. Aside from the fact of the special assessments means we cannot apply the concurrent sentence doctrine. That aside, what kind of relief can we give you, or should we give you? You've got 300 months' concurrent on seven remaining unchallenged counts. That's right. On the travel of the intent and the use of interstate facilities, we don't know if the district judge was influenced by the fact that the jury had found that this was illicit sex with underage children. And therefore, that influenced the judge to give 300 months across the board, as opposed to 250 months or 200 months. All we're asking for is a remand for the district judge to reconcile. If, in fact, the court agrees that these three counts were based on an unconstitutional use of power by Congress under the treaty power and the foreign commerce clause power. To get there, we would have to agree. We would have to say that this falls within the footnote exception of the reasoning in Clark, because, in fact, the jury was charged with an arguably non-commercial illicit sex, i.e., illicit sex, somebody under 18. Forget about the commercial thing. And that this absence, albeit the travel was within the channel of commerce, got on a plane, got off the plane, et cetera, but the act itself falls outside any commercial possible. And we would ignore the Interstate Parental Kidnapping Act. And with Cummings, we would just say, we find that we're offended by that. And then you want us to make that finding. And you would go back to the district judge and see, who, by the way, is not sitting anymore as a district judge. And then whoever came in would then decide whether or not that first judge, albeit this is only three and you've got them cold on the travel with the illicit sex. That's right. And on the first point, Your Honor, you mentioned the parental kidnapping case. That's a very strong case. In fact, we think that case supports our position of showing effects on interstate commerce. That was a child, the case that sustained it, was a child who was actually taken from the U.S., taken to another country. And what the court found was the retention of that child in the other country affected commerce because it prevented them from going back and was just a continuation from the original crime that was committed in the United States. Here this is completely untethered. This is completely untethered. If I went to a country five years from now, I violated some law in France, I could now be prosecuted in the United States District Court here simply because I'm a U.S. citizen and some years before without any intent, no connection, went to France and five years later committed the crime. If that's true, if I can conclude on this point, it is impossible for me to think that the Lopez case in the U.S. Supreme Court, which said it was unconstitutional to prosecute someone for the guns near a school in Texas would come out differently if the government had proven that the defendant a year before had traveled from California to Texas, not to possess that gun but simply to be there. We wouldn't have it. This is a sex tourism case, correct? Isn't that the theory of the prosecution? Isn't that the harm intended to be reached? Absolutely. And that's why we're not challenging the travel with the intent. And there's no federalism concern, which is what underlies the investigation. But when you strip everything else aside, he was convicted. The jury was authorized to convict in this case simply by finding he had sex with underage kids in Moldova and he had traveled sometime previously to Moldova, not with an intent to commit any crime there but happened to be there and had sex with underage children. That's the basis of the government's conviction. That was a charge that was sued. If you're going to get highly technical about this, is this more a case of just overcharging than it is really that the jury and the judge made fundamental errors and your client suffered injustice? No, there is a fundamental error here. If, in fact, you agree, and if you don't, then we don't have a problem here. If you agree that a statute that would authorize a conviction here in the United States for an illegal act in a foreign country that has no relationship to commerce, somebody goes to a country ten years later, commits an illegal act in that country, is brought back here for prosecution. If you agree with that proposition that neither the treaty clause nor the foreign commerce clause can support congressional power to criminalize that act, that's exactly what we have here because the instructions given to the jury in this case authorize a conviction completely under those terms. I guess I'm still stuck with the blatant fact of this charge and the facts underlying it, that he traveled to the country in channels of foreign commerce, came back, and that the context of this particular crime justifies excising the act itself and finding it to be criminal because it's set within that setting. I can't get rid of the setting. The problem is because the way the court charged the jury on these three counts, putting aside whatever the evidence was, this jury was authorized to convict simply by finding travel to a foreign country and then commission of a criminal act in that country, even if they were authorized to convict, even if he didn't intend to travel to that country with an intent to commit a crime and there was no commercial aspect whatsoever with respect to that crime. Whenever it happened in one week or five years or? One week, five years, 10 years, 20 years, under the government's theory. Under the government's theory, none of that matters. Wouldn't there have been a statute of limitations in all criminal cases? I mean if it was 10 years, 20 years. I know because I think from the government's point of view, if you commit the act 20 years after you travel, you still have the travel, and the statute doesn't run until you commit the act. Maybe 10 years ago, maybe two years ago. But the final act, I think, would be the criminal act and therefore the statute would. But what you've got here is an exchange for money. I mean you've got the scooter, you've got the cash, you've got the money. And if the government's. You've got the commercial, the economic aspect. And I agree 100%, Judge Barry. So you're saying the government should have been happy with a. They overcharged. The judge that said the commercial aspect of the. That's right, the government could have easily proceeded simply on the commercial aspects They decided to go for broke. They decided to go for broke. That was their choice, and the judge went along with it. Well, one of the questions I intend to ask the government is what does the C provision give you that the B doesn't? What's the additional pop? I don't know if there is any or not. I think obviously what the government would want in this case is if they thought they had a weak case on travel with the intent, then they're thinking all we have to do is prove an illicit sexual act in Moldava. I think that's why they overcharged this way. Mr. Judge, in his opinion, described the evidence in the case as overwhelming and didn't say it was less than overwhelming as to the C provision. I think my final point is the courts have consistently held no matter how overwhelming the evidence in a case may be, if the jury is not properly instructed to find each element beyond a reasonable doubt, it doesn't matter. There's no harmless error in that kind of situation. That's a structural error. But you're only challenging three counts. There were seven unchallenged that give the same sentence. As opposed to due process claim, that's correct, Your Honor. Thank you, Mr. Hrodowski. Mr. Levy. So why did the government let him introduce himself? May I introduce myself? Michael Levy for the United States. No, we have to get it on the tape. I'm sorry, Judge Hayden. Go ahead. Okay. Mr. Levy, introduce yourself. Michael Levy for the United States of America. The tape needs to know who you are. Now that we know who you are, why did you announce that you were going to arrest Mr. Levinson? Certainly. Your Honor, I've been a criminal trial lawyer for 37 years when I tried this case. And one of the things I've learned over the years is that district court judges do not like surprises. Arresting Mr. Levinson when he arrived at the airport was going to cause an explosion, and I knew that. And we all knew that. And so we were stuck with a number of bad options, and we decided the least bad option was to notify the court and notify defense counsel that this is what we are prepared to do. Well, another option would be to wait to arrest Mr. Levinson until after the trial. That would have been an option, but that would have created the risk that he would be here in Philadelphia with the boys in Philadelphia, and having demonstrated his willingness to do what the affidavit for probable cause. Should Judge Kaufman at that point say we're concerned about what we found out went on before the boys got on the plane and we don't want them near him now? That was a possibility, but given what... Is there a chance in heaven that he ever would have come here to testify? He was coming as a witness? Not that we knew. I mean, this event, your letter, by the way, you're probably never going to write another letter on July 14th as long as you live. But this letter was, you know, Merry Christmas. I mean, that was great for the defense, right? It turned out to be that way, yes, Your Honor. He wasn't going... How could he come and testify? How could he have been a witness? What was he going to say? He could have been a witness by video deposition, which was one of the possibilities. He ended up being a witness by stipulation. Clearly, if we had waited and not told anybody and arrested him when he got here, there was no way he was going to be a witness. They told you three hours after you notified him of the letter that he was... But that's the first clue you had, that he was going to be a witness. That's correct. That's probably the first time he became a witness. That's what I'm suggesting by my question. Right. Yes. The district court made findings about this set of circumstances, but there were two things it did not do. One, it specifically finds that we did not know he was a witness. As Your Honor pointed out at the beginning of that opinion, it says member of the defense team. And then further on in the opinion, on page 23 of the appendix, there's a whole discussion about how the government did not know. Bad faith with the destruction of evidence means that we were intended, bad faith as to the destruction of evidence, not bad faith in arresting a member of the defense team who was not a lawyer admitted to practice in the United States. The second thing, the court is very careful. While the court talks about the law of bad faith, the court never uses the words that the government acted in bad faith. The court said we had to know that if we did this he would not come. But the court never says that was a bad faith action. And Judge Kaufman is a very bright judge, and Judge Kaufman was very careful in the way he worded this opinion. And he never specifically used those terms as to what the government's conduct was. The government had to cause the other parts of this case, this requirement that it be material, that it cause prejudice. You have to cause the loss of evidence, and that evidence when lost has to be material. And the district court found there was no loss of evidence because the declaration was read to the jury. And when you look at opinions like California v. Trombetta, it talks about is there equivalent testimony, is there equivalent evidence. And in Trombetta, which was the destruction of the breathalyzer air samples, there's no way you could get the air back again. And what the Supreme Court opinion by Justice Marshall says is you could cross-examine and attack the integrity of the machine, and you could cross-examine the examiner and attack the way he performed the examination. That would be a sufficient substitute for the actual breathalyzer. Well, here we not only have Levinson's testimony as we thought it might be, we have it in the best possible way they could have written it because they wrote it up. It was not subject to cross-examination, unlike the opinions in Bowie v. Sullivan and in United States v. Capozzi where someone with the same interest as the government had a role in drafting that statement. We had no role other than to object to many of the things that were offered in it. At least half of that wouldn't have come in at trial. The district court judge said so himself. He said he bent over backwards. I mean, he was very, very liberal. And the rest would have been impeachment evidence. As to two of the ten witnesses for the government, and as to those two, because there were three that he gave in his statement, one of them is when you look at it, he says, I told the police nothing happened. And when that boy testified in court, he said, I told the police that nothing had happened. Every one of these kids at some point either in a courtroom in Moldova or in a sworn statement to the Moldovan police said nothing happened, which is not particularly surprising in a case of sexual abuse, particularly of young boys. And that was an issue for this jury. What he said was in a situation where you certainly would expect they were not under oath, they were not in a courtroom, they were in their own village with members of their village right there with them, they say nothing happened. I can imagine a criminal defense attorney's glee at being able to cross-examine Mr. LaVinsta if he did testify. You mean a prosecutor? A prosecutor. Your Honor, like Mr. Radofsky, I started out as a public defender cross-examining big city police officers. I may not have a lot of skills in a courtroom, but cross-examination is one of them. And I would have had a question of when to stop with this guy. Well, he would have been the gift that went on giving. And I suppose you would have recalled at least two of the boys from they were home by that time, which is why the police officer in Maldova probably figured it was okay to now go into Mr. LaVinsta, even though he shouldn't have. But I would imagine you would have done a rebuttal case, too. I would have determined what Mr. LaVinsta looked like on cross-examination before I decided to put on a rebuttal case. That's true. That's true. That's true. Well, Judge Hayden is still a district judge. Judge Barry and I have been district judges. And we are perhaps more familiar with some of these happenings than some of our colleagues. Yeah, that's true. Yeah, I mean, I think that all of us read the record with some sympathy for Judge Kaufman and everybody involved as these events just kept exploding and the pressure on everybody in a high-profile trial like this, plus vulnerable witnesses, which I don't think anybody disputed on either side. That's correct. And while I occasionally was less than judicious and diplomatic with Judge Kaufman during the course of this trial, there's no question that he was wrestling with a very difficult problem and concluded letting that statement in with everything but the kitchen sink in it was probably the best way to remedy whatever problems that he felt the government had created. And also, while at first he said you couldn't arrest him, wasn't there a point before the Maldovan authorities acted where the judge, because I think you protested in your comment. On the first day, it became very clear when the judge was talking about, you know, this may derail the trial, I don't understand how we're going to get this done. To me and to us on the prosecution team, the most important thing was trying Mr. Bianchi, not trying Mr. LaVinza. That was a tail on the dog. See, that's what three district judges understand. Right. Everybody there wanted to get that trial going and move it. And I have eight boys from Moldova, two Moldovan police officers, and two Moldovan psychologists who never testified because they were present when the boys weren't, were accustomed by the police without their parents, all set to go. If I get a delay of a week, two weeks, a month, and I have to send them all back, I seriously doubt I'm going to get them all back here. So we made the strategic choice. LaVinza is the tail on the dog. We'll withdraw the complaint. We'll promise him safe passage because that will get us past this. And when the judge, when Mr. Garagos says, well, you know, how do I know I can trust the government after all this, Judge Kaufman says because I will enforce that. And anybody that tries to arrest him will have to answer to me. I think we're satisfied as to the evolving nature of the religion. Okay. And, you know, the court found no prejudice. There's a district court who clearly was not happy with the government's conduct. I mean, he called it misguided. He called it stupid at various points during the trial. Oh, the July 14th letter, that was his waterloo. He kept mentioning that letter. That's why I asked you if you're ever going to write a letter on July 14th. Not to Judge Kaufman ever again. Not to Judge Kaufman. Now, what does the C provision give you that the B provision doesn't? I mean, all these hairy issues, not been decided except by the 9th circuit. Right. Leave the land for the Protect Act and you just go out there or? I don't, much as I enjoy writing in this court, Your Honor, I don't design my cases to get up here with difficult issues. We had an issue of did he travel with the intent? And at no point does he announce it. Unlike, like, Kekarsky, where he has communicated with the child before traveling from New Jersey to Pennsylvania. So you have a clear, the evidence is overwhelming that he has that intent. Here you have to infer intent from the fact that he keeps going back. And so certainly as to the first trip, you have to infer. There's no intent requirement, they say. There's no intent requirement on C. There is on B. Yes. And B, as to the first trip, and as to every trip, is a question mark. It's not an overwhelming case. You have to infer from what he did when he got there. You did not charge every count under B. I'm sorry? You didn't charge every count under B. If you had. I charged every count as a B. I didn't charge every count as a C. You charged 3, 5, and 10 as Cs. I think 3, 5, and 7. The two trips to Moldova and one trip to Romania, where he went to Transylvania are as Bs, travel with the intent. Because in the first trip to Romania in January. That's why my question is, what does the C give you that the B doesn't? I mean. If the jury does not find that he had the intent when he left, but formed it after he got there. How could they not find that? If they do not find that. How could they not find it? Off this record. I don't see how. One of the things I had to be. One of the things I had to be. Mr. Hedovsky tells us that it's a great tourist place, Moldova. There's a monastery, a very old monastery. And I didn't ask him whether or not Mr. Bianchi went to visit the monastery. It's clear here what happened. You know, it's clear. I don't see how there can't. You felt you couldn't prove intent as to three, five. It's clear in hindsight, Your Honor. But one of the biggest concerns I had in this case was will the boys come and when they get here, can they testify? And if you read that record, one of the boys froze on the stand. He looked around the courtroom and says, I just can't say that's the person. I didn't know how many boys that might happen to. I had three boys who were raped, a number of boys who had, you know, unwanted sex imposed on them. And I just didn't know what was going to happen when they got into an American courtroom. And so, yeah, I did backstop my case by putting in the, you know, if I got that out, then if I only had one or two that made it through, then I had the answer. So tell us why the statute is constitutional. Because the statute requires either an American citizen or a resident alien who travels in foreign commerce and thereafter has sex with a minor. And in this case, the travel is three weeks. It's continuous. He goes, he travels around these countries or in the first two he spends his time. But the statute doesn't read about continuous. That's correct. The statute reads that it could be in two years or five years. And there may come a time where a court would find that this is no longer traveling in interstate commerce. But put against that is the gun cases, singletary. Under the gun cases, a gun could have traveled in interstate commerce before the defendant was born. And when he turns 20, he is caught with a gun and he has a prior conviction. And he can be convicted as a felon in possession because the gun traveled before he was ever thought of. And yet that statute is constitutional. I think we have the same issues here. Now, you probably have difficult jury questions on whether he's still in travel. Because one of the things I had to address to the jury is, okay, this happened over there. Why are we trying it here? And at some point I think a jury is going to say, look, that belongs over there. But in terms of the power of Congress to regulate it, I don't think there's any doubt that as an American citizen traveling abroad, he will be subject to American law if Congress wants to make him subject to that law. Does the law have to specifically refer to acts overseas? Or can any American criminal statute be applied to acts overseas if the person traveled in interstate commerce to get there? In other words, the question is, could Congress make something a crime, for example, in Moldova or Germany that may or may not be a crime there, but is a crime in the United States and exercised extraterritorial jurisdiction? I don't have a good answer for that. I don't think so, but I'm not 100 percent sure. It probably can because it is an American citizen and we can regulate the conduct of American citizens. The crime we're talking about here is a crime everywhere in the world. In fact, we were careful to tailor our charging to be sure that the age of consent in the United States for this crime is the same as the age of consent in Moldova. I have ten seconds to address the commercial versus non-commercial. The judge did charge on both. Each one of the three boys that this affects, there was evidence that it was commercial. One he gave 200 Moldovan lei to. One, the second, he gave money. There's a boy, V.S., who he slayed in his house and left money on the table. And the third is M.M., who he took to Romania, traveled in Romania, paid all his expenses, paid his hotel, paid his meals. So why was the non-commercial added to the jury charge? Again, no certainty whether the boys would be able to tell the entire story. Would they tell that he gave me money or not? I knew they were going to be under tremendous stress. But the jury charge came after they testified, right? That's correct. The evidence was already in. Hindsight, perhaps I should have said, let's go with the strict commercial. But even that is not overwhelming. So we don't know which they found or whether they found both, the jury, because there were no specific instructions. That's correct. There was no specific instruction as to one or the other. As to the effect on sentencing. So we may have to consider both prongs to see that they both passed muster? In terms of does the evidence support it, I think the evidence, yes, you can do that, and the evidence does support it. We would have to find that both prongs are constitutional. That's correct. And I think that the mere traveling, even without payment, if an American goes abroad and rapes a 13-year-old, that the United States of America has the power to charge that kind of crime and to punish for it. As to the effect on sentencing that the question was asked, the Bs and Cs doubled each other. If there was a C, there was a B. It was exactly the same conduct, exactly the same force. You have ten counts sentenced, each gets 300 months conferred. That's correct. So, you know, absent some new district judge in an act of mercy saying, well, maybe if Judge Kaufman had known that 3, 5, and 7 were going to go down, that he would have given a lesser sentence. I mean, there really isn't any relief. He had Bs on each one of them. He knew it was the same conduct. The only question was which of these two statute. But Mr. Rudofsky makes the argument that the Cs are worse. And if there weren't any Cs, that on remand, there could have been, could be a lesser sentence. And he wants a remand for each sentence. If I'm MC who has testified about being grabbed and raped, I'm not sure that it makes a difference whether it was commercial or not commercial. Thank you, Mr. Levy. Thank you, Your Honor. Rebuttal. I think Mr. Levy has candidly told this Court, in answer actually to your questions, Judge Hayden, that the instruction to the jury permitted the conviction without any finding of commercial sex whatsoever. And, in fact, the government did that because they were concerned that they might not be able to prove a trial travel with the intent. So we clearly have the constitutional issue clearly posed. This jury could have found, because we don't know, there were no special interrogatories, that he was convicted solely on the basis that he traveled to Moldova, and at some time thereafter, with regard to intent or not, in terms of his travel, he committed the crime in Moldova. Again, if you think about Lopez and Morrison, the government says, well, if a U.S. citizen travels to Europe and commits a crime there, Congress can impose sanctions. Congress could not impose sanctions under a law that says, if I travel to Texas without any intent to commit a crime there, but I go into interstate commerce, and a year later, I commit a crime in Texas, which is local crime, gun near a school, the United States Supreme Court has made it clear, Congress has no power to criminalize that action. There are some limits to the Commerce Clause. It has to be commerce. It has to be commercial. It has to be economic. There is no evidence in this record that would support the conviction, in this case, on that basis. And this was worse. On the question of sentencing, these were the acts. These were the illicit acts. The other was simply travel using the phone or other means of communication. This was the essence of the government's case, and this jury was permitted to convict simply by showing that there was travel, and I think Judge Roth is absolutely right. If the court had said, or if the statute was written, well, if it was travel, then a week later, so we know there's some continuity. That's one thing. But this jury was untethered. There were no instructions to this jury that they had to find that the travel was linked to the criminal act. Well, under the statute, C starts with a sentence or a partial sentence, engaging in illicit sexual conduct in foreign places, and then goes on to say, any U.S. citizen who travels in foreign commerce and engages in any illicit sexual conduct with another person shall be fined or imprisoned not more than 30 years or both. So the target is engaging in illicit sexual conduct in foreign places. The tether to Congress's power to do that is the travel to get there, and the intent is unvarnished, engaging in illicit sexual conduct in foreign places. But there's no connection to commerce. It is engaging in a criminal act in a foreign country. By definition, a U.S. citizen would have to travel to that country. You can't have a situation where they didn't travel at some point, which is why I say this is worldwide jurisdiction to criminalize any conduct, any place in the world, as long as a U.S. citizen went to that foreign country and then committed an act, even if there's no link, absolutely no link between the travel and the later criminal act, other than the fact that there was travel. That's why this statute is so broad, which is why the government loves it. All they have to show is a criminal act in another country. And there's nothing under the Foreign Commerce Clause or the Interstate Commerce Clause. The U.S. Supreme Court has made it clear there are limits to the use of Interstate Commerce or Foreign Commerce Clause to give federal courts in the United States jurisdiction over criminal acts in a foreign country that have no impact on commerce whatsoever and are strictly noncommercial transactions. That's how broad this is, and that's the issue that was presented to the jury. Thank you. The case was very, very well argued. We will take it under advisement. The clerk will adjourn.